FRED L. MOORE *vs.* MAINE CENTRAL RAILROAD COMPANY.

Hancock.    Opinion December 15, 1909.

*Railroads.    Crossing Highways.    Statutory Provisions.    Speed.    Compact Part of Town.    Negligence.    Emergency.    Evidence.    Revised Statutes, chapter 1, section 6, clause VI; chapter 82, section 56.*

1.  The word "highway" in R. S., chapter 52, section 86, which provides that "no engine or train shall run across a highway near the compact part of a town at a speed greater than six miles an hour" is not limited to ways established by county commissioners or by municipal authority, but is used in its more generic and popular legal sense.  It embraces all public traveled ways, including ways by prescription.

2.  In the case at bar the jury were warranted in finding that the way upon which the plaintiff was traveling at the time he received his injury was a highway within the meaning of the statute.

3.  The phrase "near the compact part of a town" in R. S., chapter 52, section 86, is not limited to the largest or principal compact part of a town, but applies to any compact portion.  And in the case at bar it is held to

include a village, with church, school house, engine house, store and dwelling houses in all at least twenty-five buildings, and all situated within three hundred and fifty feet of a central point.

4. In a case where a railroad company became obligated by contract to build, and did build and plank and keep open a crossing for a prescriptive right of way, the public had a right to use the crossing. It is a crossing within the purview of R. S., chapter 52, section 86.

5. The running of an engine or train faster than the statute permits is not negligence per se, but it is competent evidence of negligence to be submitted to the jury.

6. It is not shown that the findings of the jury that the defendant company run the train which collided with the plaintiff at an unlawful and dangerous rate of speed, that this was the proximate cause of the plaintiff's injury and that the plaintiff was not guilty of contributory negligence, are clearly wrong. Nor do the damages awarded appear to be manifestly excessive.

7. Negligence is the want of that care which ordinarily prudent men use in the same circumstances, and as even ordinarily prudent men, when caught in a trap where they must act instantly, miscalculate and misjudge the fact that one caught in a passage near a railroad with a frightened team mistakenly concluded that the safest course would be to try to cross the track, and so came nearer to the track than he otherwise would, would not necessarily be negligence.

On motion by defendant. Overruled.

Action on the case to recover damages for personal injuries alleged to have been caused by the negligence of the defendant, in running one of its trains at a dangerous and unlawful rate of speed. Plea, the general issue. Verdict for plaintiff for $2750. The defendant then filed a general motion for a new trial.

The case is stated in the opinion.

*John A. Peters*, for plaintiff.

*Hale & Hamlin, and Oscar F. Fellows*, for defendant.

SITTING: WHITEHOUSE, SAVAGE, SPEAR, CORNISH, KING, BIRD, JJ.

SAVAGE, J. Action on the case to recover damages for personal injuries alleged to have been caused by the negligence of the defendant, in running one of its trains at a dangerous and unlawful rate of speed. The train collided with a team driven by the plaintiff, whereby the plaintiff was seriously injured. The defendant denies negligence on its own part, and contends that the plaintiff was guilty

of contributory negligence.   The verdict was for the plaintiff, and the case comes up on the defendant's motion for a new trial.

The collision complained of occurred at Ellsworth Falls, about five o'clock in the afternoon of December 19, 1908.   The situation may be better understood by referring to the accompanying sketch.

a. electric light pole.
b. railroad sign post.
c. watering trough.
d. platform.
e to f. crossing planks.

At Ellsworth Falls there is a junction of two roads, the Waltham road, so called, and the Bangor road.   About one hundred and eighty feet westerly from the junction there is a passage way about ninety feet long and twenty feet wide, connecting the two roads. Upon the heater piece bounded by the two roads and the passage way stand the store and storehouse of the Whitcomb & Haynes Company, and in the rear of the store is a platform, onto which the rear door of the store opens.   On the outer side of the passage way is another storehouse.   The tracks of the defendant's railroad are laid within the limits of the Bangor road all the way from a point considerably east of a watering trough which stands in the "square" formed by the junction of the two highways to a point two hundred and forty feet west of the passage way, substantially as

shown in the sketch.    From  the northerly rail  to the  platform is forty-three feet ; to  the  northwest  corner of the store is twenty-five and one-half  feet ;  to  the  southwest  corner  of  the  store  is  nearly nine feet ;  and to the storehouse on the westerly side of the passage way is  nearly thirty-three  feet.    On the west  side  of  the passage way stands an electric light pole, thirteen feet from the rail, and on the east side, ten feet from the rail, stands  a railroad sign  post  on which is a sign reading, "Railroad Crossing."    There were no other obstructions between the store and  the track.    The  train consisted of  a locomotive, tender and caboose car.    It was running northerly from Washington  Junction  to  Bangor  as  a  special, without time schedule.

The other material facts which the jury might properly have found from  the evidence, though  somewhat  in  dispute,  are these.    The plaintiff, who was a teamster in the employment  of  the Whitcomb & Haynes  Company,  was  on  his way  to the  stable, at  the  end  of his day's work.    He  drove up  the Waltham  road from  the water-ing  trough and  down the  passage  way  to the platform, for the purpose of getting several bags of meal from  the store.    His team consisted of  a pair of horses and a traverse sled.    The horses were old, well broken, accustomed to trains of  cars, and usually not afraid of them.    When the plaintiff stopped the team, the sled was abreast the platform, and the horses were facing  the railroad.    He threw  the  reins  over  a  stake  on  the  sled,  and,  leaving  the  horses unhitched, went across the platform, opened the door, took a bag of meal which was near the door, and  immediately returned to the platform, where he says he first heard the sound of  an approaching train.    The  horses were then starting, or  had  already  started  a step or two.    The plaintiff threw the bag onto the sled, and jumped on himself and  seized the reins.    What happened afterwards is in dispute.    The plaintiff  contends that  his horses  became frightened by  the approaching train, that  he  could  not stop them, and  that he then tried to swing them to the right so as to keep them off the track, and that in so doing the horses or sled or both  came in con-tact with  the passing  locomotive.    On  the other hand the defend-ant contends that the plaintiff was  attempting  to cross the track in

front of the train, and that his horses were on the track when the locomotive hit them.    Of the merit of these contentions, we shall speak later on.

Just before the time of collision, the engineer discovered the team, applied the emergency brake, and stopped the train as quickly as it could be stopped, at a distance of about two hundred and forty-seven feet from the crossing.    It was found that the horses and sled had been thrown or carried along a considerable distance. They were on the easterly side of the tracks, just at the rear end of the train when it stopped.    The horses were not much hurt. In some way, the plaintiff had been thrown under, or partly under the pilot of the locomotive, and in that position had been pushed along on the rail or ground.

The plaintiff contends that the train was proceeding at a speed variously estimated at from twenty to thirty-five miles an hour, and in violation of R. S., ch. 52, sect. 86, which reads as follows :    "No engine or train shall run across a highway near the compact part of a town at a speed greater than six miles an hour, unless the parties operating the railroad maintain a flagman, or a gate, or automatic signals ordered or approved by the railroad commissioners, at the crossing of such highway. . . . ."    The defendant had no flagman at the crossing.    Nor was there any gate or signals.

But the defendant contends, so far as the statute is concerned, that it is not applicable (1) because the passage way upon which the plaintiff was driving, and which crossed the railroad, at or near the point of collision, was not a highway within the meaning of the statute, and (2) because it was not "near the compact part of a town."    It also contends that the train was not moving at a dangerous rate of speed.    We will consider these contentions in their order.

The passage way connected two public ways.    It was a short cut-off between the Waltham road and the Bangor road.    There was evidence from which the jury might properly find that, though never laid out as a way, under the statute, it had been open, and had been commonly used by the public for the purposes of travel

for at least forty years, and that the public had gained a prescriptive right of travel over the way. The defendant, however, urges that a right to cross a railroad cannot be gained by prescription, citing *Chapin* v. *Maine Central Railroad Co.*, 97 Maine, 151. This is undoubtedly true. But it is shown in reply that the Maine Shore Line Railroad Company, which was the predecessor of the defendant company, when it built its road, took a deed of the premises where this passage way crossing is, and that deed contained the following provision :—"Said company by acceptance of this deed promising to construct and maintain one train crossing over the track on said strip herein conveyed." And it also appears that the defendant has kept the crossing open, has kept it planked, at times has stretched a rope across the way while fast trains have been passing, and has maintained a sign at the crossing on which are the words "Railroad Crossing," which as well as being a warning, was an invitation to the public to use the crossing. In view of these facts, which are undisputed, we think that at the time of the accident the public had a right to cross the railroad from the passage way, at least, with teams, and that is all that this case calls for.

The next question is, was the passage way a "highway" within the meaning of the statute? In the chapter of definitions, R. S., ch. 1, sect. 6, cl. VI, it is provided that "the word 'highway' may include a county bridge, county road or county way." In *Cleaves* v. *Jordan*, 34 Maine, 9, the court, referring to this definition, said :—"The meaning of the provision appears to be that, when the word [highway] is used in the statutes, its import should be that which is mentioned in the article, unless the sense would require a different one." And in *Waterford* v. *County Comrs.*, 59 Maine, 450, the court, again referring to the same definition, said :—"The meaning of this provision is that when the word is used, its import is to be taken as thus defined, unless the obvious sense of the statute should require a different construction." It follows, therefore, that the word "highway" in a statute generally means a county way, a way leading from town to town, and established by county commissioners, as distinguished from a town way which is within the territorial limits of a town. and is laid out by

municipal authority. But as the cases cited show, this is not an absolute rule. It does not apply when it is obvious that the word is used in a statute in a different sense. And that may appear either from the purpose of the statute itself, or from the context. It seems clear to us that the meaning of the word "highway" in the statute we are considering was not intended by the legislature to be limited to the definition in the statute of definitions, which we have cited. Its obvious purpose was to protect public travel at railroad crossings. Now, if "highway" means only county way, then all town ways are excluded from the operation of the statute. Yet the dangers at town way crossings are as great as are those at highway crossings. And it happens, as is well known, that perhaps the larger number of ways in the compact portions of towns are town ways or streets, laid out and built by towns to accommodate a growing population. It will be absurd, and we shall do violence to the statute, if we hold that "highway" in this statute means only a county way. Keeping in view the object of the statute, we think it should be held, and we do hold, that the word "highway" in this statute is used in its more generic and popular legal sense. A highway is defined by Webster as "a public road, a way open to all passengers." "Every thoroughfare which is used by the public, and is, in the language of the English books, 'common to all the king's subjects,' is a highway." 3 Kent's Com. 4321. "The word 'highway' embraces every kind of public ways common to all citizens." "A highway is a passage open to all citizens of the state to go and return, pass and repass, at their pleasure." See the numerous definitions in 4 Words and Phrases, 3292. When used in the popular sense it includes all public traveled ways, whether county or town. *Harding* v. *Medway*, 10 Met. 465.

The passage way in question was a public way, and so was a highway within these definitions. The railroad company treated it as a public way, and the plaintiff had a right to use it as such. And it was within the protection of the statute regulating the speed of trains across highways.

Next, was this highway "near the compact part of a town?" We think the jury was not only warranted, but required, to answer

the question in the affirmative. It is true it was not the only compact portion of the city of Ellsworth. It was not the largest compact portion. The statute does not mean that. We have no doubt that it was intended to prohibit and does prohibit, the running of trains faster than six miles an hour over crossings near any compact portion of a town, where there is no flagman, nor gate, nor signals. Ellsworth Falls is a little village, with church, school house, engine house, stores and dwellings, in all at least twenty-five buildings, and all within three hundred and fifty feet of the Whitcomb & Haynes store. Such a settlement is "a compact portion of a town" within the meaning of the statute.

On this branch of the case it remains to inquire whether the speed of the train was unlawful, and whether it was dangerous, so that negligence may properly be inferred from it. The speed was unlawful if it exceeded six miles an hour; and the train hands called as witnesses all agree that it did exceed that rate. So it may be regarded as settled that the speed was unlawful. But that is not enough. The running of a train faster than the statute permits is not negligence per se. But it is competent evidence of negligence to be submitted to the jury. *Neal* v. *Rendall*, 98 Maine, 69. It is not conclusive. Alone, it may be sufficient, and it may not. If not, when considered alone, it may be when taken in connection with other evidence. In this case it will serve no useful purpose to analyze the testimony. The estimates of speed were, as is usual, widely variant. After a careful examination of the testimony we cannot say that it clearly appears that the jury erred in finding, as it necessarily must have found, that the train was run at an unlawful and dangerous rate of speed, that the defendant's servants were guilty of negligence in so running the train, and that their negligence was a proximate cause of the plaintiff's injury.

A more difficult question arises when we inquire whether it has been sufficiently shown by the plaintiff, upon whom was the burden, that he was free from contributory negligence. And it is all the more difficult, because some phrases of the plaintiff's own testimony seem to show that he was negligent, while others tend to show the contrary.

In the first place, the defendant claims that the plaintiff was violating an ordinance of the city of Ellsworth, which provides that "every person having the care of any team in any street of the city shall at all times be so near the team as to have perfect control thereof, unless the same be properly fastened." Assuming that this ordinance is applicable to the facts of this case, we say, as we said of the violation of the statute by the railroad trainmen, that a violation of the ordinance is only evidence of negligence. It is not conclusive. Whether leaving unhitched a pair of old, well broken, work horses such as these are described to have been, while the driver stepped across a platform, opened a door and took out a bag of meal which was close by the door, did so deprive the driver of uch "perfect control" as is reasonably contemplated by the ordinance, and whether the violation of the ordinance was actually negligence, and, if so, whether it contributed in the end to the injury, are questions which have been settled by the jury, under instructions to which no exceptions were taken, and settled adversely to the defendant's contention. And we see no good reason to disturb their finding in this respect.

While it is claimed by the defendant that the plaintiff, having learned while in the store that a train was coming, negligently drove down onto the crossing in an attempt to cross over ahead of the train, it is contended for the plaintiff, as already stated that he did not know of the approach of the train until he stepped out onto the platform, that the horses had already stepped forward a step or two, that, although not ordinarily afraid of cars, they were frightened at this time and became more so, that he tried to stop them, and, being unable to do so, that he tried to swing them around to the right to prevent their getting onto the track, and while doing so the team was struck by some part of the locomotive. And, in this claimed condition of affairs, it is urged that there was no want of ordinary care on the part of the plaintiff. This is the view that the jury took, and we are of opinion that it has not been shown to be clearly wrong.

Not much light is thrown upon the affair by the physical effect of the collision itself. Just what happened no one knows. And

no one ever can know just what will happen in a case of collision between a powerful moving force like a locomotive and a team. The bag of meal, it is claimed, was found on one side of the track and the horses and sled on the other, and the plaintiff was under the pilot. If the horses were where the engineer says they were when struck, it is difficult to understand how they could have escaped with so slight injuries. And upon either theory it is not easy to see how the plaintiff got under the pilot. But he did.

The claim of the plaintiff that the horses were frightened and that he tried to stop them, and then to turn them, is corroborated by the testimony of two other persons who saw the affair. A witness called by the defendant testified that he heard the word "whoa" shouted by someone back of the store, and no one else is shown to have been there, besides the plaintiff. The same witness it is true, says he heard also the expression "giddap." There was evidence, too, that it had been arranged by the drivers of the four teams of the Whitcomb & Haynes Company who were at work on the same job, that the plaintiff's team and another one should go to the store on the way to the stable that night and get meal for all; and it was in pursuance of this arrangement that the plaintiff had driven to the rear of the store. He testified that he had intended to get five or six bags, but he had in fact taken only one when he heard the sound of the train. If it be true, and we think the jury might well believe it, that the plaintiff's purpose there was to get several bags of meal, there seems to be no reason why, having taken only one bag, he should, of his own volition, drive away and try to get across the track ahead of the train. If his team was not frightened, and was under control, it would naturally be expected that he would wait and take on the other bags of meal. This circumstance points strongly to the conclusion that something happened which took the attention of the plaintiff from the meal to the care of the team. All this evidence certainly furnished some basis for the conclusion that the plaintiff did not start from the platform with the intention of crossing the track at that time. And, even if, after he had found himself in a position of danger, he had mistakenly concluded that the safest course would be to try to cross the track, and so

came nearer to the track than he otherwise would, that would not necessarily have been negligence. Negligence is the want of that care which ordinarily prudent men use in the same circumstances. And even ordinarily prudent men, when they are caught in a trap, and must act instantly, miscalculate and misjudge. But the plaintiff claims that all the time after he became aware of the approach of the train he acted with all the care which he had any opportunity to exercise. And in considering the question of contributory negligence, it should be remembered also that there is an electric light pole thirteen feet from the track, on one side or the other of which the horses had to pass. This fact may have added to the confusion and difficulty of the situation.

It is suggested by the defendant that instead of turning to the right, the plaintiff should have turned the horses to the left where there was no obstruction to his passage. We think however that it cannot be said to have been negligence necessarily, because the plaintiff turned his frightened horses away from the approaching train rather than towards it, under the circumstances. Nor would it necessarily be so, even if he had, in the stress of the moment, decided unwisely, and unfortunately for himself.

On the whole, we think there is sufficient evidence to sustain the verdict of the jury on the question of liability.

The amount of the verdict is also complained of. But it does not seem to be clearly excessive. The frightful experience of the plaintiff and the consequent nervous shock, together with the other physical ailments of the plaintiff call for very substantial damages.

*Motion for a new trial overruled.*